

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 13, 2023

**BY ECF & EMAIL**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

     Re:    *United States v. Rahmiek Lacewell,* **22 Cr. 352 (JSR)**

Dear Judge Rakoff:

     Rahmiek Lacewell is scheduled to be sentenced on July 20, 2023.  The Government respectfully submits this letter in connection with his sentencing.

     As discussed in more detail below, Rahmiek Lacewell was a member of a racketeering enterprise that used threats of violence and actual violence to gain control of the entire fire restoration industry in parts of New York City.  The crew used mob tactics like shakedowns, indiscriminate assaults, and threats to harm children and family members to impose their will over potential competitors and turn those competitors into steady streams of extortion payments.  The entire industry lived in terror of this crew.  Some shut down their operations and stopped work entirely.  Others paid the extortion demands in order to maintain some degree of income.  In either case, the harm was widespread.  In addition to extorting the fire restoration industry, this crew engaged in widespread fraud by altering the conditions of properties—such as removing illegal stoves—in order to ensure insurance coverage on a claim.

     Lacewell—a longtime associate of the crew's leader, Jatiek Smith—was an enterprise member who assisted in its fraud and its intimidation.  In light of his substantial criminal history and his conduct in this case, the Government submits that a sentence of at least 48 months imprisonment is appropriate.

**I.     Offense Conduct**

     As described in the Presentence Report (the "PSR"), in June 2022, a Grand Jury in this District returned Indictment 22 Cr. 352 that charged Lacewell with racketeering and extortion conspiracies, in violation of Title 18, United States Code, Sections 1962(d) and 1951.  On March 20, 2023, Lacewell pleaded guilty to racketeering conspiracy.  (PSR ¶ 7).

### A.    Industry Background

The fire restoration industry involves businesses that mitigate damages and undertake repairs resulting from fires.  The industry includes both emergency mitigation service ("EMS") companies and public adjusters, both of which are hired by the property owner.  EMS companies clean up the damaged property, which includes sweeping up, removing debris, and ventilating the property. Public adjusters, which are independent contractors licensed by the state, investigate, process, submit, and negotiate insurance claims with insurance carriers.  Property owners pay the public adjuster with a percentage of the settlement paid out by the insurance carrier on the claim. (*Id.* ¶¶ 18-20).

EMS companies compete to sign projects (or "losses") by approaching a property owner directly.  One way EMS companies compete for work is by arriving on the scene of a fire soon after it has occurred, sometimes called "chasing a fire."  Losses can involve either the home that caught on fire (often referred to as the "main") as well as adjacent properties that were exposed (the "exposure" or "expo") to the fire and sustained indirect damage.  If a property owner hires a particular EMS company, the EMS company will often make a referral for a particular public adjuster to process the associated insurance claim.  Public adjusters also compete to sign projects by approaching the property owner, and, in turn, make referrals to the property owner for EMS companies.  Based upon state licensing requirements, public adjusters cannot solicit work from property owners overnight.  EMS companies can solicit work from property owners at any time, including after business hours and overnight.  (*Id.* ¶ 20).

### B.    The First Response Enterprise

Jatiek Smith was hired by First Response Cleaning Corp., a Brooklyn-based EMS company, in approximately October 2019.  (*Id.* ¶ 21).  Although not the owner of First Response, Smith eventually assumed control over the company's business, its ongoing activities, its hiring decisions, and its finances.  (*Id.*).  Smith, a self-identified and high-ranking member of the Bloods gang (specifically, the Tombstone Gangsta or "TSG" set), hired other Bloods members—including Lacewell—who reported to him to work for First Response.  Smith and his subordinates formed an enterprise that extorted and assaulted competitors in the fire restoration industry (the "First Response Enterprise" or "Enterprise"), including competitors who operated or were based in the Southern District of New York.  (*Id.* ¶¶ 21-22).

The First Response Enterprise embarked upon a sustained course of violence and intimidation, including through establishing a system of rules that competitors were required to follow, assaulting competitors who violated the Enterprise's rules, and extorting payments from competitors.  Over the course of the Enterprise's existence, its members and associates, led by Smith, engaged in extortion of other industry members, wire fraud through a scheme to defraud insurance companies and further enrich First Response, and obstruction of justice and witness tampering by tampering with witnesses in an effort to hamper the federal investigation that led to the Indictment in this case.  (*Id.* ¶ 24, 33-35).

In approximately mid-2020, the Enterprise pushed out its leading competitor ("Company-1") through violence, threats of violence, and extortionate demands.  Smith attacked Company-1's

managers, threatened its workers, and ultimately drove Company-1 out of business.  Smith demanded that Company-1 pay him $100,000 if it wanted to continue to chase any fires.  (*Id.* ¶ 22).  Company-1 did not pay Smith's extortion demand and effectively went out of business.

After successfully eliminating Company-1, the defendants then imposed rules on other participants in the fire restoration industry and threatened other EMS companies and public adjusters with violent assaults if they did not obey the directives of the Enterprise.  Under First Response's industry rules, which changed over time, First Response generally demanded all nighttime fires at the beginning of the month.  After First Response had obtained some set number of fires (approximately 10 or 11 fires), Smith allowed other EMS companies to sign night fires, but only with his permission.  For jobs that did not have to go to First Response, Smith and the other First Response members decided which public adjuster and which EMS company were allowed to sign any particular fire loss.  Smith later exerted control over daytime fires, too, similarly determining who was permitted to sign each fire. Smith and his men enforced this system of rules with public displays of violence and threats of violence designed to intimidate industry participants into compliance.  (*Id.* ¶¶ 24-32).

EMS companies and public adjusters had to make extortionate payments to the Enterprise and its members in order to sign any fire loss—even the limited number of fire losses they were allowed to sign under First Response's rules.  (*Id.* ¶ 23).  Some victim EMS companies were required to make payments to the Enterprise, sometimes on a weekly basis, in order to be permitted to sign any fires.  One way the Enterprise received extortionate payments from EMS companies was by having those companies make weekly salary payments to Enterprise members.  Other industry participants, including public adjusters, were required to pay a kickback to the Enterprise, usually representing some portion of the payment from the insurance company.

## C.      Rahmiek Lacewell's Role in the Conspiracy

In late 2020, Lacewell was hired to perform cleanup work for First Response.  In that role, he assisted the enterprise in committing fraud.  Payments on losses caused by fire damage are typically paid by a homeowner's insurance carrier.  Certain conditions at a loss, including for example, illegal stoves or kitchens, can render a property ineligible for insurance coverage.  Where feasible, First Response's cleanup crew, including Lacewell, removed or attempted to remove those disqualifying features from fire sites that could render a loss uninsurable, knowing that false information about the property would then be conveyed to insurance companies for purposes of obtaining insurance payouts.  This practice, along with the extortionate payments that the enterprise received, allowed the enterprise to maximize its profits.

But Lacewell's involvement in the enterprise was not limited to the enterprise's fraud. Lacewell was also part of an October 21, 2021 assault on a construction worker.  That day, Sequan Jackson ordered his crew to assault a construction worker who he believed had disrespected First Response and Jatiek Smith.  (*Id.* ¶ 32).  Video surveillance from the scene of the assault shows Lacewell arriving in his First Response uniform, changing into black clothing—the clothing that crew changed into when they were engaged in violence and shows of force—and walking toward the construction worker.  Stills from the video footage showing Lacewell changing from his First Response uniform to his black clothing are included below.







For disrespecting the enterprise, Smith's crew, including Lacewell, now dressed in his black clothing, encircled the construction worker, who was then punched in the face. Later, the construction worker's identification card was photographed as a threat if he were to cooperate. (*Id.* ¶ 32).

## II.    The Defendant's Plea and the Presentence Report

On March 20, 2023, the defendant pleaded guilty to racketeering conspiracy. Under the parties' plea agreement, they stipulated to a Guidelines Range of 51 to 63 months' imprisonment, based on predicates for acts involving wire fraud and extortion. The parties also determined that the defendant is in Criminal History Category V. With acceptance of responsibility, the parties stipulated the Guidelines Range to be 51 to 63 months' imprisonment (the "Stipulated Guidelines Range"). The Probation Department adopted the same Guidelines calculation as the plea agreement and recommends a sentence of 36 months' imprisonment. (*Id.* ¶ 137).

## III.    Discussion

### A.    Applicable Law

After calculating the applicable Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B.  A Substantial Sentence of At Least 48 Months' Imprisonment is Warranted

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.  These considerations weigh in favor of a sentence of at least 48 months' imprisonment.

*First*, the defendant's criminal conduct was indisputably serious.  Lacewell was a trusted member of Jatiek Smith's criminal enterprise.  He assisted the enterprise in committing fraud— which helped maximize the profits that the crew made when it took over the fire restoration industry.  In addition, as a long-time associate of Smith, Lacewell was called upon to be an intimidating presence and support the Enterprise's use of violence, as evidenced by his involvement in the October 21, 2021 assault.  Smith's success in dominating the fire restoration industry depending on having people, like Lacewell, that he could call upon to show the Enterprise's willingness to use threats, intimidation, and force to ensure its dominance.  Accordingly, a substantial sentence of at least 48 months' imprisonment is necessary to reflect the nature and seriousness of the offense, to provide just punishment for the offense, and to promote respect for the law.

*Second,* a sentence of 48 months' imprisonment is necessary for specific deterrence to protect the public.  Since he was 18, Lacewell has sustained five felony or misdemeanor convictions, which included sex offenses and narcotics offenses.  In addition, he was convicted of reckless endangerment after he was involved in a gang-related shootout.  (*Id.* ¶ 90).  Even though some of these prior sentences were significant—he received a 42-month sentence for narcotics trafficking in 2014—they have failed to deter him from committing the instance offense.  Accordingly, a substantial sentence of at least 48 months' imprisonment is necessary for public safety and specific deterrence, in light of the significant risk of recidivism.

*Third*, a substantial sentence is necessary for general deterrence.  The First Response Enterprise besieged the fire restoration industry through violence, extortion, fraud, and obstruction of justice.  The Court's sentences in this case is necessary to send a strong message in the fire restoration industry that such conduct will be met with significant consequences.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a substantial sentence of at least 48 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Rushmi Bhaskaran
Marguerite B. Colson
Elizabeth A. Espinosa
Adam S. Hobson
Assistant United States Attorneys
(212) 637-2439 / 2587 / 2216 / 2484

cc:   Glen A. Kopp, Esq. (by ECF)
      Daniel L. Stein, Esq. (by ECF)